NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0409n.06

No. 14–2354

MARK J. IVEY,

    Plaintiff-Appellant,

v.

JOHN M. McHUGH, Secretary of the Army,

    Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)

FILED
Jun 05, 2015
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN

BEFORE: SUTTON, GRIFFIN, and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Colonel Mark Ivey, a former Flight Surgeon in the Michigan Army National Guard, appeals the district court's grant of summary judgment to the Secretary of the Army ("Army") in Ivey's challenge to the Army Board for Correction of Military Records' ("Records Board") denial of his petition to amend his military records to reflect that he had obtained the aeronautical designation of Army Aviator under a program available to certain National Guard members. The district court granted the Army's motion for summary judgment, finding that the Records Board did not arbitrarily or capriciously deny Ivey's petition because the program under which Ivey sought relief had been discontinued and, in the alternative, because "Ivey did not meet all of the requirements of the lapsed program." We AFFIRM.

**I.**

Ivey, a medical doctor, served in the Michigan Army National Guard ("Michigan Guard") from 1994 to 2009 as an Army Flight Surgeon. Ivey was assigned to the Army Aviation Support Facility located in Grande Ledge, Michigan, which is equipped with various helicopters,

including the Bell UH-1H Iroquois (commonly known as a "Huey"). In 1994, Ivey, who previously had pursued a private pilot's license to fly helicopters, attended the Army's Flight Surgeon course at Fort Rucker, Alabama, and received his Flight Surgeon Badge, denoting that he had completed the process to receive an aeronautical rating recognized by the Army.[1] Army Reg. 600–105, Chapter 2, Table 2–2. In his capacity as a flight surgeon, Ivey was required to engage in a minimum number of sorties each year and log a certain amount of flight time each year. He was permitted to fly at a military helicopter's controls if he was accompanied by an authorized instructor pilot.

After receiving his Flight Surgeon Badge, Ivey completed the training needed to obtain his civilian private pilot's license to fly helicopters. In so doing, Ivey was able to log over half of the flight time he needed in military helicopters. Ivey continued flying with Army instructor pilots, and by 1996, his commanding officer, Lieutenant Colonel Robert Staake, recommended that Ivey consider pursuing a dual-designation and obtain an Army Aviator rating through the Army National Guard's "Civilian Aviator Accession Program." Prior to Ivey joining, a number of pilots in the Michigan Guard had been commissioned through the Program. Apparently Staake was not aware that the Program had been discontinued.

The Program was created in the mid-1980s when the Army National Guard was suffering from a lack of qualified pilots. To replenish its ranks, the Army offered an expedited mechanism for civilian-trained pilots who were already in the Army National Guard to become operational Army pilots. The Program required that an applicant have certain civilian ratings and experience, that the applicant's unit need a particular flight slot filled, and, that if accepted, the applicant complete tactical training under the guidance of Army instructors at Fort Rucker,

---

[1]Ivey subsequently rated as a Senior Flight Surgeon and Master Flight Surgeon, more advanced aeronautical ratings that require specific medical specialties and additional flight hours. Army Reg. 600–105, Ch. 2, Table 2–2.

Alabama (or acquire a waiver from the Commanding General of Fort Rucker in lieu of formal training). In the early 1990s, the Program was discontinued because it "was for the National Guard only and addressed a shortage need for operational aviators in units that are no longer deemed critical enough to justify short-cutting the formal 9 month [course] that all candidates must now complete." By 1994, the Program was removed from Army Regulations. *See* Army Reg. 600–105 (1994).

Unaware that the Program had been discontinued, Ivey continued to pursue each of the Program's requirements with vigor. By 2001, Ivey formally applied for the Army Aviator designation under the Program, and by 2002, he had completed all of the aviation-related steps (at least 700 flight hours, a commercial rating, and an instrument rating) that he believed were required. At this point, Staake, still unaware that the Program no longer existed, recommended that Ivey be "consider[ed] for appointment to Army Aviator," and Ivey's Army flight instructor, similarly unaware, recommended that a Flying Evaluation Board ("Evaluation Board") "be convened to review [Ivey's] qualifications for designation as an [sic] U.S. Army Aviator."[2] When the Program was in place, an Evaluation Board was charged with reviewing an applicant's qualifications, ensuring that the applicant had satisfied all of the Program's requirements, and offering a non-binding recommendation on whether the applicant should be awarded the new designation. The Evaluation Board's recommendation would be forwarded to the Commanding General at Fort Rucker, who would make the final determination. In Ivey's case, the requested Evaluation Board was not convened.

One year later, in 2003, Ivey again requested that an Evaluation Board review his qualifications for the Army Aviator designation. Ivey also petitioned his local congressman for

---

[2]Generally, an Evaluation Board is convened for punitive reasons, or to lift a punishment that had been levied on an aviator. Army Reg. 600–105, Ch. 4. However, under the terms of the Program, an Evaluation Board's recommendation was required, and thus it served a non-punitive function.

support. When explaining his situation, Ivey told the congressman that the "mechanism" for him to receive the dual designation "still exists," but later explained that he "know[s] that this [is] not a current Army program." The congressman sent a letter on Ivey's behalf to Major General Thomas Cutler, the Adjutant General of the Michigan National Guard, who was responsible for convening Evaluation Boards.

On November 7, 2003, in a letter responding to the congressman, Cutler explained that the Program "no longer exists," and further explained that, even if the Program still existed, Ivey had not met all of its requirements: "individuals selected [for the Program] were also required to complete a program of instruction at the Army Aviation Center at Ft. Rucker[,] Alabama." This formal training lasted 12 weeks, required 36 hours of flight instruction, and was "followed by tactical aircraft training . . . that resulted in aircraft and Army aviation tactics qualification." Cutler then addressed Ivey's situation, and explained why his dual-designation was unnecessary:

> the Army has two aeronautical designations, Army Aviator and Flight Surgeon
> . . . [Ivey] does now possess the appropriate aeronautical designation; flight
> surgeon. . . . It is not expected that flights surgeons regularly fly at a set of flight
> controls in the aircraft in order to be able to understand and provide valuable
> advice to commanders regarding human factors of flight.

In concluding, Cutler explained that he had not conveyed an Evaluation Board because an "[Evaluation Board] would have no impact in granting [Ivey's] wishes, as he is not qualified for any current program."[3] The congressman relayed Cutler's message to Ivey, passed along Cutler's letter, and reiterated that the Program "no longer exists."

Ivey appeared content with Cutler's answer until March of 2004, when Cutler delegated his authority to convene Evaluation Boards to a subordinate, Lieutenant Colonel Cary Cuyler, who immediately convened an Evaluation Board to determine whether Ivey should be awarded

---

[3]This is because the Evaluation Board would "have no impact on starting a program that requires Department of the Army level staffing, funding and approval."

the "aeronautical designation of Army Rot[a]ry Wing Aviator." The Evaluation Board, which consisted of three high-ranking Army officers, unanimously recommended that Ivey: (1) "be awarded the aeronautical designation of [Army Aviator]"; (2) "be issued [National Guard Bureau] Aviation Service orders"; and (3) "be utilized in an aviation position requiring aviation duties." It is unclear if this recommendation was forwarded, lost, or shelved[4]; in any event, Ivey was never granted final approval from the appropriate Commander at Fort Rucker, the undisputed final step in receiving the dual-designation.[5]

Over the next five years, Ivey continued to accumulate hours in military helicopters. In 2009, Ivey separated from the Michigan Guard. In 2012, Ivey petitioned the Records Board to change his military records and award him (1) "the aeronautical designation of [Army Aviator], to be issued by National Guard Bureau aviator orders"; (2) "the Army Aviator Badge, in accordance with the [Program]"; and (3) "an aeronautical designation order by the Commander [at Fort Rucker]."

The Records Board acknowledged that Ivey had been "very diligent in his pursuit of obtaining [an Army Aviator designation]," and "that he received favorable encouragement and support from the leadership at the [Michigan Guard]." However, it denied his petition because: "the evidence also shows that the [Program] had been discontinued in 1994, approximately 10 years prior to his appearance before the [Evaluation Board]"; it found no evidence that "a position that would require the skills of both a flight surgeon and an [Army Aviator] . . . has ever been established"; it found no evidence that "the approving authority [at Fort Rucker] ever granted [Ivey] any waivers of formal training or approve[d] any exception to policy to permit

---

[4]The Records Board speculates that Ivey may not have ever heard about the Evaluation Board's recommendation because the Program had been discontinued when the recommendation was made.

[5]Ivey states that he was aware that he could not proceed without a good recommendation from the Evaluation Board, and seems to acknowledge that a good recommendation itself was not enough; he recognizes that "the appropriate Commander at Fort Rucker would have final approval."

[Ivey's] receiving a rating as an [Army Aviator]"; it found no evidence that Ivey was promised that his designation would be changed "if he continued to pursue this action"; and it found that even if Ivey had met all of the Program's requirements, which included "completion of [formal 12-week training] at Fort Rucker, there is still no guarantee that the needs of the Army at the time would have supported changing his <u>primary</u> specialty from flight surgeon to [Army Aviator]." Thus, the Records Board unanimously denied Ivey's petition.

Ivey filed an appeal in the district court under the Administrative Procedures Act, 5 U.S.C. § 701, *et seq.*, and argued that the Board's decision denying his petition was arbitrary, capricious, or not based on substantial evidence. The Army moved for summary judgment, and the district court granted the Army's motion, finding that the Board had not erred. Ivey now appeals.

## II.

We review the district court's grant of summary judgment *de novo*, "using the same standard of review applicable in the district court." *Gecewicz v. Henry Ford Macomb Hosp. Corp.*, 683 F.3d 316, 321 (6th Cir. 2012). We may set aside the Records Board's decision only if it is arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence. 5 U.S.C. § 706(2)(A); *Frizelle v. Slater*, 111 F.3d 172, 176 (D.C. Cir. 1997). Under this standard, the decision must contain "a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted). We cannot "substitute [our] judgment for that of the agency." *Id*. Although some courts have been even more deferential to military boards than civilian agencies, *see, e.g.*, *Piersall v. Winter*, 435 F.3d 319, 324 (D.C. Cir. 2006), we need not

decide if a more deferential standard applies in this case, because even under the less deferential standard that applies to all agency actions, we must affirm.

The Program was described in the 1983 version of Army Regulation 600–105. The "eligibility requirements" for an Army Aviator aeronautical rating included a section that applied to "[reserve component] officers with civilian acquired skills." Army Reg. 600–105, Ch. 2, Table 2–2 (1983). Beyond requiring various civilian ratings, at least 700 flight hours, and a Class 2 medical certificate, an applicant had to attend the "Rotary Wing Qualification Course" at Fort Rucker, unless the Commanding General of the Army's Aviation Center (which is located at Fort Rucker) "approve[d] an abbreviated or specially constructed course of instruction."[6] Army Reg. 600–105, Ch. 2–3 and Table 2–2 (1983). Further, the applicant had to be filling a vacant position that, if left vacant, "would adversely affect the readiness of the unit," and "no other rated aviators [could be] available to fill the position." Army Reg. 600–105, Ch. 2–3(b), (c) (1983).

In 1994, the Army amended Regulation 600–105, effective January 15, 1995, and stated that the amended version "applie[d] to all commissioned and warrant officers who are training for or have Army aeronautical ratings." Army Reg. 600–105 (1994). A "Summary of Change" document explained that: "This revision revises eligibility requirements for award of aeronautical ratings (chap 2 and table 2–2)." The "revision" eliminated all references to the Program, except one footnote stating that "[t]he 700 hours required under the [Program] may be included for Senior or Master wings awards." Army Reg. 600–105, Ch. 2, Table 2–2, n.3 (1994). Unlike the former version, the amended regulation did not include the eligibility option related to "reserve component officers with civilian acquired skills"; it did not explain how an "Army

---

[6]The regulation is clear that the Army Aviator rating "will not be awarded until . . . the training prescribed [above] is completed." Army Reg. 600–105, Ch. 2–3(f) (1983).

Aviator (with civilian acquired skills)" could "apply for an aeronautical rating"; and it did not detail any of the requirements, such as Rotary Wing Qualification School, 700 flight hours, a Class II Medical, or various ratings. Simply put, the Program was completely removed from the Army Regulations.

Thus, the Records Board had a sound basis for concluding that the Program "had been discontinued in 1994, approximately 10 years prior to [Ivey's] appearance before the [Evaluation Board]." Further, the Records Board did not arbitrarily or capriciously determine that *even if* the Program still existed, Ivey did not satisfy its requirements. There is no evidence that Ivey would be filling a necessary but vacant position, or that no other rated aviators could fill the position if one existed. Finally, the Records Board did not arbitrarily or capriciously determine that Ivey failed to complete the "formal training" requirement, and that the Commanding General of Fort Rucker had not granted him a waiver or other exception to the policy. Accordingly, the Records Board's decision was not arbitrary, capricious, or otherwise errant, and the district court properly granted summary judgment to the Army.

We are sympathetic that Ivey was misled by the apparently well-intentioned leadership at the Michigan Guard, and understand his desire to be recognized for his service. But this does not allow us to breathe life into the long-lapsed Program.

## III.

For the foregoing reasons, we AFFIRM.